# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0508V

|  |  |
|---|---|
| JERRY TAYLOR, | Chief Special Master Corcoran |
| Petitioner, | Filed: October 2, 2023 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Bridget Candace McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Jennifer Leigh Reynaud*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On April 27, 2020, Jerry Taylor filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that that he suffered a left shoulder injury related to vaccine administration ("SIRVA") resulting from a Hepatitis B vaccine received on October 23, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties could not agree on a damages sum.

For the reasons set forth below, I find that Petitioner is entitled to a damages award in the amount of **$65,000.00 for actual pain and suffering, plus $1,449.05 in actual unreimbursable expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

This case was activated on May 28, 2020 (ECF No. 9). In September of 2021, Respondent conceded that Petitioner was entitled to compensation, and the parties began damages discussions (ECF Nos. 21-23). On December 19, 2022, Petitioner reported that they had reached an impasse (ECF No. 36). Petitioner therefore filed a damages brief on February 9, 2023 (ECF No. 41), and Respondent reacted on March 23, 2023 (ECF No. 43). On October 2, 2023, the parties filed a joint status report stating that they agree that Petitioner should be awarded $1,449.05 for past unreimbursable medical expenses (ECF No. 45). The matter of damages is now ripe for resolution.

## II. Relevant Medical History

On October 23, 2018, Petitioner received a Hepatitis B vaccine intramuscularly in his left deltoid. Ex. 1 at 2. On the same date, he also received a pneumococcal polysaccharide vaccine in his left deltoid, and an influenza vaccine in his right deltoid. *Id.* The vaccines were administered during a routine follow up visit with Petitioner's internist Dr. Katherine Greco. Exs. 5 at 27; 7 at 146.

Almost two months later, on December 20, 2018, Petitioner messaged Dr. Greco, reporting that he had been experiencing pain in his left shoulder that began several days after the vaccinations. Ex. 7 at 221. He thought it would go away, but instead it was worsening and he was getting worried and inquired whether he should be seen. *Id.* He had been taking ibuprofen that helped him get through the day. *Id.* A nurse responded, asking Petitioner to schedule an office visit. *Id.* at 220-21.

Petitioner was seen two days later (December 22nd) at Peachtree Immediate Care. Ex. 2 at 1. He reported left shoulder pain since his vaccinations seven weeks earlier. *Id.* His pain level was eight out of ten. *Id.* On examination, his left shoulder exhibited moderate tenderness and reduced active and passive range of motion ("ROM"). *Id.* at 1-2. X-rays were normal, other than moderate degenerative changes. *Id.* at 8. He received an intramuscular injection of dexamethasone and methylprednisone, and was given meloxicam and a physical therapy ("PT") referral. *Id.* at 2-3.

On December 26, 2018, Petitioner was seen by internist Dr. Julien Orieta, reporting shoulder pain that began two months earlier after receiving vaccine injections. Ex. 5 at 50. Ibuprofen was ineffective, and the pain was worse at night. *Id.* On examination, his ROM was decreased in abduction and he had pain with external rotation. *Id.* at 51. Dr. Orieta referred Petitioner for an orthopedic consult and ordered an MRI. *Id.* It does not appear that the MRI was later performed, however.

On January 15, 2019, Petitioner presented to orthopedic physician assistant ("PA") David White for a consultation. Ex. 5 at 61. Petitioner reported moderate left shoulder pain and stiffness that began in October of 2018 following vaccinations. *Id.* Ibuprofen and Mobic provided minimal relief. *Id.* The intramuscular steroid injection he received on December 22nd had provided about five days of relief. *Id.* On examination, his left shoulder was tender to palpation. *Id.* at 64. His ROM in forward elevation was 90 degrees (active ROM) and 140 degrees (passive ROM). *Id.* He had positive Neer's impingement signs. *Id.* Petitioner was assessed with left shoulder joint pain and stiffness. *Id.* PA White discussed treatment options, including ice/heat, rest, activity modification, a home exercise program, anti inflammatories/Tylenol, formal PT, steroid injections, and possible surgical intervention. *Id.* at 65. Petitioner elected to move forward with PT and Diclofenac. *Id.*

Petitioner presented for a PT initial evaluation on February 28, 2019. Ex. 4 at 12. He explained that his pain began the evening that he received vaccinations in his left arm, and had persisted and worsened since then. *Id.* His pain was worse at night and with activity. *Id.* at 11. Medication helped him sleep, and a cortisone injection in late December helped for "only 2 weeks." *Id.* at 12. His pain was currently at a level of two out of ten, and at worst his pain it ranged to eight out of ten. *Id.* On examination, his left shoulder active ROM was 110 degrees in flexion, 95 degrees in abduction, and 30 degrees in external rotation. *Id.* He had positive results on the empty can test. *Id.*

Petitioner continued PT through May 6, 2019, attending a total of 19 sessions. Ex. 4 at 12-69. After almost a month of PT, on March 25, 2019, his left shoulder active ROM had improved to 148 degrees in flexion, 112 degrees in abduction, and 35 degrees in external rotation. *Id.* at 30. He still needed medicine to sleep at night and had pain with sudden movements, certain types of motion, and lifting weights. *Id.* A few weeks later, on April 16, 2019, his active ROM had improved to 150 degrees in flexion, 142 degrees in abduction, and 60 degrees in external rotation. *Id.* at 48. His pain occurred mostly at night. *Id.* At his final PT session on May 6, 2019, Petitioner reported that he was now able to sleep five to six hours at night, as compared to one to two hours previously. *Id.* at 69. He still had some pain but had shown improvement, and was discharged with a good prognosis. *Id.* He rated his current pain level as two out of ten, at worst ranging to six out of ten. *Id.*

On May 21, 2019, Petitioner returned to PA White. Ex. 5 at 119. He reported that he had done 8-10 weeks of PT "with good improvement." *Id.* He was now able to sleep on his shoulder, and his ROM was much better. *Id.* He had some remaining stiffness and discomfort, but was happy with the improvement. *Id.* The pain was worse at night, and stiffness was worse in the morning. *Id.* at 124. His left shoulder examination was

3

"unremarkable," with no tenderness to palpation, negative results on the Hawkin's and Jobe's tests, and negative Neer's sign. *Id.* at 122-23. PA White assessed him with adhesive capsulitis and osteoarthritis of the left shoulder. *Id.* at 123. Petitioner declined an MRI or cortisone injection, and was directed to return to care if his symptoms persisted or worsened. *Id.*

On October 4, 2019, Petitioner was seen by internist Dr. Neha Thakor to establish care. Ex. 7 at 494. He reported that his shoulder was "just now improving." *Id.* He was given a refill of diclofenac for left shoulder pain and stiffness. *Id.* at 497. He was given an influenza vaccine in his left deltoid. Ex. 1 at 1. Petitioner returned to Dr. Thakor on November 14, 2019. Ex. 7 at 535. The "active problem" list included left shoulder stiffness, but the record is otherwise silent on his left shoulder. *Id.*

Eight months later (July 12, 2020), Petitioner messaged Dr. Thakor. Ex. 7 at 763. He stated that he had been taking diclofenac for his shoulder, and wondered if it would help with his back pain as well. *Id.*

Over a year later, on September 6, 2021, Petitioner messaged Dr. Thakor inquiring about his diclofenac refill. Ex. 7 at 1040. He stated that he tried not to take the tablets daily, trying to use ointment or something less potent as much as possible. *Id.* The record does not indicate the condition for which he was taking diclofenac.

### III.    Affidavit and Unsworn Personal Statement

Petitioner submitted an affidavit and an undated and unsworn personal statement in support of his claim. Exs. 6, 8. The affidavit fulfills the minimal statutory requirements for a Vaccine Act claim, but provides no details about his condition and its effect on him. Ex. 6.

Petitioner's personal statement provides some support to his claim; however, it is unsworn, which reduces its weight. Ex. 8. Petitioner states that "this has been a very life changing and debilitating experience." *Id.* He states he has "been in constant pain since I received the vaccines," rating it at six or seven during the day and between eight and ten at night. *Id.* He takes prescription medication at night to "even have a possibility of a few hours sleep" and states that sometimes he gets no sleep because of throbbing shoulder pain. *Id.*

Petitioner asserts that before his injury he was a very active person and that his injury "has robbed [him] of some of the activities" he previously enjoyed. Ex. 8. He has struggled to do things he normally could do, such as caring for fish aquariums, bowling,

4

fishing, swimming, tennis, drawing, painting, and household and car repairs and maintenance, getting dressed, showering, and cooking. *Id.*

### IV. The Parties' Arguments

Petitioner proposes an award of $75,000.00 in pain and suffering. Petitioner's Brief in Support of Damages, filed Feb.8, 2023 (ECF No. 41) ("Br."). He cites six cases in support of his position, all of which involve pain and suffering awards precisely consistent with his demand. *Goring v. Sec'y of Health & Human Servs.*, No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019); *Capasso v. Sec'y of Health & Human Servs.*, No. 17-14V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019); *Attig v. Sec'y of Health & Human Servs.*, No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019); and *Kim v. Sec'y of Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018).

Petitioner argues that he suffered a mild to moderate SIRVA. Br. at *8. He did not seek care until two months after his vaccination because he thought the pain would go away. *Id.* He treated with 19 PT sessions, and at discharge his ROM had improved and he was sleeping better, but still had stiffness and discomfort. *Id.* Petitioner asserts that his case is similar to the six cases he cites, including in his brief a chart comparing the time between vaccination and initial presentation, duration of injury, and treatment received for his injury to the other cases. *Id.* at *9. Petitioner requests $1,449.05 for out of pocket medical expenses, stating that Respondent is in agreement on this sum. *Id.* at *1.

Respondent counters that Petitioner's pain and suffering award should not exceed $42,500.00. Respondent's Response to Petitioner's Brief, filed Mar. 23, 2023 (ECF No. 43) ("Resp."). To support his proposed award, Respondent cites *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 in pain and suffering); and *Merwitz v. Sec'y of Health & Human Servs.*, No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022) (awarding $50,000.00 in pain and suffering).

Respondent characterizes Petitioner's injury as mild and limited, as evidenced by his delaying care for two months. Resp. at *9. The objective record evidence indicates that his symptoms were limited to approximately seven months, and he showed significant improvement with conservative treatment including an intramuscular steroid injection, 19 sessions of PT, and prescription pain medication. *Id.* Although Petitioner later

5

received refills of diclofenac, Respondent argues that the evidence weighs in favor of Petitioner's SIRVA being essentially resolved, noting that he was given a flu vaccine in his left shoulder a year after the vaccine at issue in this case. *Id.* Concerning the September 2021 diclofenac refill, Respondent argues that it is unclear why Petitioner was taking this medication. *Id.* Respondent states that he does not object to Petitioner's request for past unreimbursable expenses. *Id.* at *1.[3]

### V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and

---

[3] While Respondent's brief proposed an award of $1,499.05 for past unreimbursed expenses (Resp. at *1), the parties later clarified that they agreed the award should be $1,449.05 (ECF No.45).

suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## VI.   Prior SIRVA Compensation Within SPU[5]

### A.   Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[6]

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do

7

In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[8]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,377* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these

---

with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### VII.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU

---

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

9

SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Mr. Taylor suffered a relatively mild SIRVA, and the award should accordingly fall below the median. His pain and suffering was at its most intense for approximately three months, but by seven months post-vaccination his pain occurred mostly at night and he was well enough to stop actively treating, although he continued to use medication for his shoulder for over a year thereafter. His ROM restrictions were initially moderate, but quickly improved with PT. He had one intramuscular steroid injection, which provided only short-term relief. He attended 19 PT sessions in just over two months.

Of the cases cited by the parties, the most comparable to present facts are *Bordelon* (with a pain and suffering award of $75,000.00) and *Merwitz* (with a pain and suffering award of $50,000.00). The petitioners in those cases, like Mr. Taylor, each had one steroid injection and attended similar amounts of PT. They had injuries of similar duration, although Mr. Taylor continued taking medication for his shoulder for a year longer, suggesting persistent residual symptoms that should be factored into the award.

Mr. Taylor was first seen for his injury 60 days after vaccination, which is much later than the petitioner in *Bordelon* (15 days), but sooner than the petitioner in *Merwitz* (91 days). The petitioner in *Bordelon* exhibited a slightly more severe injury, as evidenced by her seeking treatment sooner and higher reported pain level of nine out of ten. Mr. Taylor was still experiencing pain ranging from two to six out of ten when he was discharged from PT, more significant than the *Merwitz* petitioner, whose pain ranged from zero to two at discharge.

I find that Mr. Taylor's injury falls between *Merwitz* and *Bordelon*, and Mr. Taylor should therefore be awarded $65,000.00 for actual pain and suffering.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $65,000.00.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[11] **I also find that Petitioner**

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994))..

**is entitled to $1,449.05 in actual unreimbursable expenses**.[12]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $66,449.05, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] The parties are in agreement as to damages for unreimbursable expenses. Br. at 1; Joint Status Report, filed Oct. 2, 2023 (ECF No. 45).

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.